AO 91 (Rev. 02/09) Criminal Complaint

# United States District Court
### for the
### Western District of New York

United States of America

v.

**MICHAEL JOYCE and SARAH SHULTIS,**

Defendants

Case No. 24-MJ-543

## CRIMINAL COMPLAINT

I, <u>Jessica Nelson,</u> the complainant in this case, state that the following is true to the best of my knowledge and belief: between on or about April 6, 2016, and April 17, 2024, in the Western District of New York and elsewhere, the defendants, MICHAEL JOYCE and SARAH SHULTIS violated:

(1) 18 U.S.C. § 641 (Theft of Government Funds)
(2) 18 U.S.C. § 1001 (False Statements)
(3) 18 U.S.C. § 1343 (Wire Fraud)
(4) 18 U.S.C. § 1349 (Conspiracy to Commit Wire Fraud)
(5) 18 U.S.C. § 371 (Conspiracy to Defraud the United States)

This Criminal Complaint is based on these facts: **SEE ATTACHED AFFIDAVIT OF VA OIG SPECIAL AGENT JESSICA NELSON.**

☒ Continued on the attached sheet.

_____
JESSICA NELSON
Digitally signed by JESSICA NELSON
Date: 2024.04.19 12:33:27 -04'00'

JESSICA NELSON, VA OIG

Affidavit and Criminal Complaint submitted electronically by email in .pdf format. Oath administered, and contents and signature, attested to me as true and accurate telephonically pursuant to Fed.R.Crim. P. 4.1 and 4(d) on:

Date: <u>April 22, 2024</u>

City and State: <u>Rochester, New York</u>

_____
Judge's signature

MARK W. PEDERSEN
UNITED STATES MAGISTRATE JUDGE

# AFFIDAVIT IN SUPPORT OF CRIMINAL COMPLAINT

STATE OF NEW YORK    )
COUNTY OF MONROE    )    SS:
CITY OF ROCHESTER    )

I, JESSICA NELSON, being duly sworn, depose and state:

1. I have been employed as a Special Agent since 2010 and with the Veterans Affairs Office of Inspector General ("VA OIG") since 2021. In my current position at VA OIG, my duties include the investigation of various crimes including obtaining federal benefits through fraud and conspiracy to defraud the government. I have received training through the Federal Law Enforcement Training Center regarding the investigation of fraud schemes and conspiracy. Throughout my career as a Special Agent, I have conducted numerous successfully prosecuted investigations involving fraud schemes.

2. I make this affidavit in support of a criminal complaint charging MICHAEL JOYCE ("JOYCE") and SARAH SHULTIS ("SHULTIS") with violating Title 18, United States Code, Sections 641 (Theft of Government Funds), 1001 (False Statements), 1343 (Wire Fraud), 1349 (Conspiracy to Commit Wire Fraud), and 371 (Conspiracy to Defraud the United States) (collectively, the "TARGET OFFENSES").

3. I base this affidavit on my training and experience, information I have personally reviewed as the primary case agent on this investigation, and information I have received from others, both in person and in documentary form.

4. Since this affidavit is being submitted for the limited purpose of establishing

1

probable cause to support a criminal complaint, I have not included every fact known to me concerning this investigation. Rather, I have set forth only the facts I believe are necessary to establish probable cause to believe that JOYCE and SHULTIS committed the TARGET OFFENSES.

## PROBABLE CAUSE

*Application for and Receipt of Disability Compensation Benefits*

5.  Department of Veterans Affairs ("VA") disability compensation is a benefit paid to veterans with injuries or diseases that were sustained while on active duty or were made worse by active military service. It is also paid to certain veterans disabled from VA healthcare. The benefits are tax free.

6.  JOYCE submitted his initial claim for disability compensation and underwent his initial compensation and pension examination in 2015. The compensation and pension examination is the standard vehicle by which veterans receive a disability rating. On or about August 12, 2015, JOYCE received a proposed 20% disability rating from the VA for a left ankle fracture. The 20% disability rating became effective March 26, 2016.

7.  On or about April 6, 2016, JOYCE submitted additional claims for Post-Traumatic Stress Disorder ("PTSD"), an issue with his left hand, asthma, anxiety disorder, major depressive disorder, panic disorder, sleep apnea, GER, hypertension, tinnitus, gout, an unidentified left knee issue, an unidentified left ankle issue, an unidentified right ankle issue, Traumatic Brain Injury ("TBI"), and unidentified cardiac issues.

8.      During his May 5, 2016, polytrauma consultation for a TBI evaluation, JOYCE described a 2013 incident where he was exposed to an Improvised Explosive Device ("IED") explosion less than 50 feet away. He described a second incident that occurred in 2009 wherein he fell off of a 10-to-15-foot-high building, hitting his head. He claimed he did not receive medical assessment for either incident. This exam along with other exams for headaches resulted in JOYCE receiving a disability rating of 30% for migraine headaches secondary to his TBI.

9.      On or about August 11, 2016, the VA received JOYCE's specific statement in support of his PTSD claim. In his initial statement, JOYCE claimed numerous unverifiable stressors from 2007 and from his 2008 mobilization to Fort Dix, New Jersey. JOYCE further reported that during a 2008 training mission in the Dominican Republic, he became separated from another member of his unit, J.B., witnessed a stabbing, and was then attacked himself. He also reported hearing gunfire in and around the unit's housing compound and, while digging out a pipe full of mud, came upon the bodies of dead children. JOYCE asserted that the attack and the images of the dead children caused him to have recurring nightmares and anxiety. JOYCE was subsequently awarded a 100% disability rating for reported PTSD on December 2, 2016, which was retroactively made effective on March 26, 2026.

10.     On or about October 17, 2016, JOYCE had another compensation and pension exam for a purported back condition. JOYCE presented with significantly decreased range of motion. Based on his exam, JOYCE's range of motion was reported as:

>   Forward Flexion (0 to 90): 0 to 25 degrees
>   Extension (0 to 30): 0 to 5 degrees
>   Right Lateral Flexion (0 to 30): 0 to 10 degrees

        Left Lateral Flexion (0 to 30): 0 to 10 degrees
        Right Lateral Rotation (0 to 30): 0 to 10 degrees
        Left Lateral Rotation (0 to 30): 0 to 10 degrees

11.    JOYCE reported to the examining clinician that his limited range of motion and pain in his lower back precluded him from dressing himself or putting on his shoes. Based on his presentation and description of the pain, the examining clinician surmised that JOYCE would not be able to maintain employment that required bending, pulling, reaching, pushing, or lifting. JOYCE was subsequently awarded a 40% disability rating for his back issues.

12.    On or about January 19, 2018, JOYCE submitted VA Form 21-526EZ, Application for Disability Compensation and Related Compensation Benefits, to apply for a status of permanent and total disability ("PTD"). PTD status removes an individual's obligation to continue getting re-evaluated for various disabilities, and makes them eligible for other veteran benefits.

13.    On or about February 21, 2018, JOYCE submitted VA Form 21-4138, Statement in Support of Claim, as a follow up to his PTD claim. In his statement, JOYCE asserts, "Every disability that I have either is the same but will not get better or has gotten worse." He stated that his PTSD has not improved, that he is more housebound, and feels that he will die if he goes outside. JOYCE was subsequently granted a PTD status on or about April 27, 2018.

14.    On or about July 9, 2019, JOYCE submitted VA Form 21-686c Declaration of Status of Dependents. On the form, JOYCE lists himself as married and living with his wife. He continued to list seven additional dependent children he shares with his wife. Inclusion

of dependents raises a veteran's compensation benefit. In 2019, the base compensation payment for a 100% disabled veteran (not including any special compensation rates) was $3,171.12 per month. Adding a dependent spouse and seven dependent children under the age of 18 raises that payment to $3,860.55 per month.

15. When one of the children, V.J., reached the age of 18, JOYCE submitted a Statement in Support of claim, dated May 21, 2019, that V.J. should remain a dependent on his claim due to a severe mental disability.

16. JOYCE continues to receive VA disability compensation and special monthly compensation in the amount of $4,737.42 per month via electronic funds transfer ("EFT"). He has received over $393,158.14 in payments from VA as of March 2024.

***Enrollment in the Caregiver Support Program***

17. The VA Caregiver Support Program ("CSP") offers clinical services to caregivers of eligible and covered veterans enrolled in the VA health care system. The program's mission is to promote the health and well-being of family caregivers who care for our Nation's Veterans, through education, resources, support, and services. One benefit afforded through the CSP is the caregiver stipend, a monthly, tax-free payment.

18. On November 30, 2017, JOYCE and SHULTIS applied for SHULTIS, as JOYCE's purposed caregiver, to receive payments through CSP. On or about January 3, 2018, JOYCE and SHULTIS met with VA CSP personnel. JOYCE presented with his hands contracted. He reported that he was unable to fully open them. JOYCE and SHULTIS asserted that JOYCE needs a cane for balance and is unable to manage household activities

and requires assistance from SHULTIS. They further asserted that JOYCE is wholly reliant upon SHULTIS for household cleaning, shopping, transportation, and administration of his medications.

19. During a follow-up meeting on or about January 10, 2018, JOYCE and SHULTIS reported JOYCE has very limited movement based upon his ailments and requires the assistance of SHULTIS to move from the toilet and from the couch. They further asserted that JOYCE requires SHULTIS to assist him with food preparation, feeding, bathing, dressing, and use of the telephone. Based upon JOYCE's level of disability and the care allegedly required from SHULTIS, SHULTIS was approved for the CSP as a tier 3 recipient, the highest tier. After a retroactive payment of $8,345.82 on or about February 28, 2018, SHULTIS began to receive $2,890.14 per month for the care of JOYCE.

20. Based upon his reported ailments, JOYCE received a motorized wheelchair in May 2018. JOYCE and SHULTIS reported to CSP personnel that JOYCE tries to walk as much as possible at home with the assistance of his cane but is reliant upon the wheelchair when outside of the home.

21. As part of the requirements of the CSP, CSP personnel met with JOYCE and SHULTIS multiple times per year to review their needs or assess any changes. CSP has met with JOYCE and/or SHULTIS either in person, video call, or phone call, multiple times from 2018 through March 2024. During a March 1, 2019, home visit, the CSP representative noted JOYCE was unable to open his hand enough to shake the representative's hand. JOYCE and SHULTIS continued to present JOYCE as incapable of managing household activities, unable to walk any distance without a cane or use of a wheelchair, and unable to fully open

his hands.

22. Specifically, JOYCE and SHULTIS have consistently reported to CSP personnel since joining the program in 2018 that JOYCE cannot perform typical activities of daily living, such as feeding himself, dressing himself, bathing, and walking long distances without assistance. SHULTIS has made regular claims that she feeds JOYCE, dresses JOYCE, brushes his teeth, helps him use the toilet and wipes him after using the toilet. In a November 8, 2022, contact with CSP personnel, JOYCE claimed he moved to a ranch style apartment for ease of using his wheelchair and that he often fell down the stairs at his previous residence. During the most recent communications with CSP personnel in November 2023 and March 2024, JOYCE and SHULTIS have continued to report there have been no changes to JOYCE's condition or caregiver requirements and claim JOYCE still relies on a wheelchair.

23. SHULTIS has continued to receive CSP payments. As of March 2024, SHULTIS has received over $213,000 via EFT.

*Interviews of JOYCE's Unit Members*

24. A review of JOYCE's Army personnel file found no orders for deployment to either Afghanistan or Iraq or medical records to support his claims of experiencing an IED explosion.

25. On or about January 30, 2020, agents interviewed A.A., a former member of the 7207th MSU. A.A. recalls JOYCE from his time with the unit. A.A. described JOYCE as competent, intelligent, and physically fit. A.A. participated in the 2008 training mission to

7

the Dominican Republic. A.A. stated the unit's mission was to provide basic medical care to individuals living in remote areas. The entire unit's daily activities were fully accounted for from approximately 0430-0500 until 1700-1800. When not out on mission, the unit was housed at a Dominican Republic Army ("DRA") compound. If members of the unit wished to leave the compound to eat or drink, they were accompanied by a DRA security detail. Although the unit's mission was strictly medical support, JOYCE was a known handyman and helped fix a plumbing issue at a local school where the unit was providing medical care. A.A. stated the unit's footprint was so small that if anyone found a body, especially a child's body, it would have been very big news. A.A. stated the Dominican Republic training mission was uneventful. No one reported any gunfire, muggings, or other issues.

26. On or about September 13, 2021, agents interviewed I.R. regarding his knowledge of JOYCE. JOYCE helped I.R. with logistics during the Dominican Republic training mission. Recent storms had damaged plumbing at some of the schools where the unit was operating. I.R. and JOYCE fixed some of the bathrooms and installed a new sewer pipe. I.R. and JOYCE were together for all the plumbing repairs. I.R. said there were no reports of anyone finding a body or body parts during the mission. Unit members were allowed to leave the DRA compound with three or more personnel and always had an armed guard from the DRA accompany them.

27. JOYCE lived with I.R. from approximately 2012 to 2017 while going through his divorce, and shared several details inconsistent with JOYCE's purported disabilities.

28. JOYCE remodeled multiple bathrooms in I.R.'s home. I.R. estimated that, in or around 2015, JOYCE borrowed I.R.'s ladder to repair his estranged wife's roof by himself.

8

JOYCE is very health conscious and does not smoke, drink, or do drugs. I.R. stated JOYCE has never been deployed to a combat zone.

*Surveillance*

29.     I reviewed video footage taken on or about January 14, 2019, of JOYCE driving a black Chevrolet SUV to Buybuy Baby. In the video, JOYCE can be seen squatting down and lifting a large furniture item, possibly a dresser, and loading it into the back of his SUV. On this same date, agents observed JOYCE drive to the Rochester VA Outpatient Clinic, which at that time was located at 465 Westfall Road, Rochester, NY 14620. JOYCE can be seen walking from the clinic to his vehicle with no apparent difficulty.

30.     I reviewed video taken by VA OIG on or about June 28, 2019, of JOYCE walking unassisted and without apparent difficulty into and out of the Rochester VA Outpatient Clinic on Westfall Road.

31.     On or about February 10, 2020, agents observed and took video of JOYCE walking to and from a claim hearing at the Buffalo VA Regional Office, 130 South Elmwood Ave, Buffalo, NY 14202. I reviewed the video and observed JOYCE walking unassisted and without apparent difficulty, using his phone and getting in the driver's seat of a vehicle.

32.     On or about October 20, 2020, agents observed JOYCE on video walking unassisted and without apparent difficulty into the new Rochester VA Outpatient Clinic located at 260 Calkins Road, Rochester, NY 14623. I reviewed video from the clinic security camera system showing JOYCE walking without difficulty as well as standing and talking with a clinic employee.

9

33. From on or about November 18, 2020, until on or about March 10, 2021, a covert surveillance platform was positioned to observe JOYCE's residence. The home is positioned on the side of a hill and JOYCE can be seen walking up and down his driveway without assistance or difficulty. JOYCE is seen on video on a regular basis performing household maintenance tasks, vehicle maintenance, driving, leaving the residence unaccompanied multiple times per day and often for hours at a time. While performing household maintenance tasks, JOYCE was recorded climbing a ladder to clean his gutters. On several occasions, JOYCE can be seen bending over to pick up a child and then carry the child. JOYCE is seen on video placing the child in and removing the child from a car seat. JOYCE is also recorded shoveling snow in the vicinity of his driveway and sidewalk on several occasions. He is also seen driving a lawn tractor fitted with a snow blower to clear his and his neighbor's driveways.

34. JOYCE is seen to use a motorized wheelchair only once, on March 9, 2021, between approximately 1536 and 1600. JOYCE took a child for rides up and down his driveway and then onto the street. It should be noted that on March 9, 2021, prior to the use of the motorized wheelchair, JOYCE is seen walking, running, and picking up and carrying a child in his driveway. JOYCE can be seen walking with a normal gait until he walks to the wheelchair and sits down at approximately 1536. Following the completion of the motorized wheelchair ride, JOYCE can be seen walking about his property with a normal gait.

35. On March 18, 2024, I reviewed a video taken by VA OIG of JOYCE. JOYCE and SHULTIS recently moved to NJ and provided VA with their new address at 2350 New York Ave, Egg Harbor City, NJ 08215. JOYCE was seen driving near his residence and then

10

parked in the parking lot of a Wawa located at 600 White Horse Pike, Egg Harbor City, NJ 08215. JOYCE exits his vehicle and is seen walking to and from the vehicle in the parking lot. JOYCE is also seen squatting down looking under the vehicle, putting on a sweater, and laying on his back and sliding underneath the vehicle and examining the undercarriage of the vehicle. JOYCE appears to walk without difficulty and walks unassisted throughout the entire video. JOYCE is also seen using both his hands to open the doors to the vehicle and holding drinks.

36. On April 17, 2024, VA OIG personnel visited the 2350 New York Ave. address to conduct an interview of JOYCE and/or SHULTIS. JOYCE walked to and answered the door without apparent issue. VA OIG personnel observed a split level home design within the 2350 New York Ave. address, with multiple sets of stairs throughout the home. JOYCE appeared to present normally until the VA OIG personnel identified themselves, at which time JOYCE changed his body posture and contracted his hands to the point where he was purportedly unable to grasp the agent's business card. JOYCE refused to answer questions about his injuries or service.

37. JOYCE continues to collect disability payments from the VA to date. SHULTIS continues to receive CSP payments to date.

*Routing of VA EFT Payments*

38. Electronic VA Compensation and Pension payments are initiated by VA and administered by the United States Treasury. ACH/EFT payments originate at the Austin, TX VA Information Technology Center (ITC) and are then routed to the Hines VA ITC

before being routed to the Kansas City, MO US Treasury processing site. The US Treasury then distributes payments to individual beneficiaries.

## CONCLUSION

39.     Based on the above information, I submit there is probable cause to believe that Michael JOYCE and Sarah SHULTIS have committed the TARGET OFFENSES.

JESSICA NELSON
Digitally signed by JESSICA NELSON
Date: 2024.04.19 12:30:46 -04'00'

Jessica Nelson
Special Agent
Veterans Affairs
Office of Inspector General

Affidavit submitted electronically by email in .pdf format. Oath administered, and contents and signature attested to me as true and accurate telephonically pursuant to Fed. R. Crim. P. 4.1 and 41(d)(3) on April 22, 2024.

_____
HON. MARK W. PEDERSEN
United States Magistrate Judge